# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL NO. 08-508-01 |
| v. | : | CIVIL NO. 12-5856 |
| | : | |
| JAMES EDWARD CLARK | : | |

---

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                              **FEBRUARY 24, 2015**

Presently before this Court is Petitioner, James Edward Clark's ("Clark"), Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 ("§ 2255 Motion").  For the reasons set forth below, this Motion is denied.

## I.      BACKGROUND

On February 11, 2009, Clark was convicted by a jury after a trial held before this Court of one count of attempting to manufacture methamphetamine in violation of Title 21, United States Code, Section 846, and one count of possession of red phosphorous, a precursor chemical used in the illegal manufacture of methamphetamine in violation of Title 21, United States Code, Section 841(c)(1).  On November 6, 2009, this Court sentenced Clark to a term of 360 months imprisonment, and 240 months to be served consecutively.  Clark appealed his convictions and sentence.  The United States Court of Appeals for the Third Circuit ("Third Circuit") affirmed.  See United States v. Clark, 419 F. App'x 248 (3d Cir. 2011).

Clark filed a pro se § 2255 Motion on October 16, 2012, and raised the following claims: (1) ineffective assistance of trial counsel for "pre-trial failures to investigate, interview witness and obtain documentary proof of petitioner's defense"; and (2)  "[a]ctual and factual innocence

of the charged crimes." (§2255 Mot. at 5-6.) The Government filed its Response to the Motion on March 1, 2013. (Doc. No. 91).

The Government's case at trial was based on evidence that Clark provided chemicals and equipment to a cooperating witness, Arthur Hummel (the "CW"), so that the CW could conduct illegal "meth cooks" and manufacture crystal methamphetamine ("meth") for Clark to distribute. Unbeknownst to Clark, the CW was working in an undercover capacity with law enforcement agents. The CW secretly recorded conversations with Clark, during which Clark agreed that the CW would manufacture crystal methamphetamine from the chemicals and equipment supplied by Clark. (Govt.'s Resp. at 1.)

Clark filed a pro se Reply to the Government's Response on April 29, 2013. (Doc. No. 96.) On May 13, 2013, we ordered that an evidentiary hearing was to be held on June 21, 2013. (Doc. No. 97.) On May 15, 2013, we appointed Michael Engle, Esq. ("Engle") to represent Clark. (Doc. No. 98.) The June 21, 2013 hearing, however, was continued to July 19, 2013. On July 11, 2013, Engle wrote to this Court and requested a continuance of the July 19, 2013 hearing. (Doc. No. 101.) Engle also stated in this letter that he needed time to reply to Government's Response, speak to his client regarding his inability to file pro se motions since he was appointed to represent him, and to locate the defense files for this case. (Id.)

An evidentiary hearing was held on October 28, 2013, at which Clark's trial counsel, Gregory Pagano, Esq.[1] ("Pagano"), testified along with Gregory Yensan, Special Agent of the DEA ("Agent Yensan"). At the conclusion of the hearing, Engle requested time to inquire about finding a forensic chemist who would testify on Clark's behalf. (Evidentiary Hearing, 10/28/13,

---

[1]Pagano represented Clark at his trial and sentencing.

at 109.)  On January 24, 2014, this Court granted Clark's Motion to obtain expert witness

services and approved compensation for this expert.  (Doc. No. 105.)  Clark retained the services

of forensic chemist, Heather Harris ("Harris"), and on May 9, 2014, another evidentiary hearing

was held, at which,  Harris testified.  Clark, subsequently, filed an Amended § 2255 Motion, and

the Government filed a Supplemental Response.  (Doc. Nos. 114, 118.)

In this Amended Motion, Clark raised the following ineffective assistance of trial counsel

claims:

> 1.  defense counsel failed to effectively challenge the
> Government's forensic expert chemist and related evidence both
> prior to and during trial while also prejudicing the Defendant by
> not consulting with or retaining a defense expert in the field of
> forensic chemistry;
>
> 2.  he was denied the effective assistance of counsel and his
> fundamental right to testify at trial in his own defense based on the
> erroneous advice and decisions of defense counsel prior to and
> during trial; and
>
> 3. trial counsel was ineffective for failing to properly conduct a
> defense investigation prior to trial and for failing to present the
> testimony of available defense witnesses who could have testified
> to facts that supported his proffered theory of defense.

(Am. § 2255 Mot. at 5-20.)

Clark has submitted an affidavit[2] in support of his ineffective counsel claims which is

summarized as follows:

> 1.  On May 27, 2008, the CW appeared at Clark's home with the
> intent to entice him to participate in the acquisition of narcotics
> from people he thought Clark might know, and that the substance
> he provided to the CW on that date was never used by him in an

---

[2]Clark chose not to testify at either evidentiary hearing.  Rather, he submitted an affidavit in support of his claims.

attempt to manufacture methamphetamine because that substance was just a "sludge" produced by him by mixing contents of powered vitamin supplements;

2.  Clark gave the CW the bag of "sludge" on the premise that it was the remnants of a botched methamphetamine cook, and that he devised the ruse as a pretext to meet the CW later because the CW owed Clark and his friends debts in excess of $50,000.  Clark chose the methamphetamine story with the CW because he knew of the CW's past involvement with methamphetamine;

3.  The vitamin supplement called Vitablend ("Vitablend") which Clark intentionally misrepresented as a botched methamphetamine cook was kept in abundant supply in his house and office for use in protein drinks.  Clark knew that the substance was incapable of use in methamphetamine production and was shocked when the CW claimed to have produced methamphetamine;

4.  Upon Clark's arrest on June 3, 2008, he informed Agent Yensan that he could not be in possession of methamphetamine because the sludge provided to the CW was not capable of being converted into methamphetamine.  After his arrest, Clark told agents that an additional nineteen pounds of the substance was to be delivered that night by Ron Lavan and he offered to have it delivered in their presence.  He adds that that evening agents remained at his home with him as Ron Lavan delivered the substance;[3]

5.  Clark informed Pagano of all these facts before trial, including the fact that the substance was fake and provided the names of corroborating witnesses, including Eric Rolfing, Ron Lavan, Sherry Baker, and Mary Lynn Hallas, but he neither obtained receipts for the Vitablend or attempted to corroborate this with these witnesses;

6.  Between arrest and trial, Pagano assured Clark that the false statements contained in the complaint and search warrant would result in dismissal of the charges, and Pagano took no further action during that time.  Clark did not see Pagano again until September 3, 2008, when he informed Clark that he was indicted. Pagano also advised him, at that time, that if he pursued a defense with witnesses to testify that they helped him to provide the

---

[3]It is noted that in his affidavit, Clark inexplicably numbers the paragraphs 1 through 20, and then after paragraph 20, numbers the subsequent paragraphs 13 through 38.

substance to the CW that conspiracy charges could be added
against him; and

7.  Clark would have testified on his behalf if not for Pagano's
advise, and Pagano made no effort to verify his claims or interview
witnesses.

(§ 2255 Mot., Clark Aff. ¶¶ 4-28.)

## II.    STANDARD OF REVIEW

Clark is entitled to relief only if his custody or sentence violate federal law or the

Constitution.  Section 2255 provides, in pertinent part:

> A prisoner in custody under sentence of a court established by Act of
> Congress claiming the right to be released upon the ground that the
> sentence was imposed in violation of the Constitution or laws of the
> United States, or that the court was without jurisdiction to impose such
> sentence, or that the sentence was in excess of the maximum authorized by
> law, or is otherwise subject to collateral attack, may move the court which
> imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255 (2008).

In Strickland v. Washington, the Supreme Court of the United States set forth a two-

prong test for evaluating a claim of ineffective assistance of counsel.  466 U.S. 668 (1984).  A

finding against the petitioner under either prong is sufficient to find for the government.  United

States v. Ciancaglini, 945 F. Supp. 813, 816 (E.D. Pa. 1996).

First, a petitioner must show that counsel's performance was deficient, meaning that

counsel made errors so serious as to deprive petitioner of the "counsel" guaranteed by the Sixth

Amendment.  Strickland, 466 U.S. at 687.  This evaluation must be based upon the facts of the

case at the time of counsel's conduct.  Id. at 690.  "[T]he right to effective assistance of counsel

does not guarantee that an attorney will never err." Diggs v. Owens, 833 F.2d 439, 446 (3d Cir. 1987).  Therefore, to satisfy this prong, petitioner must show that counsel's performance fell below an objective standard of reasonableness under the prevailing professional norms. Strickland, 466 U.S. at 688.  However, "[a]n attorney is presumed to possess skill and knowledge in sufficient degree to preserve the reliability of the adversarial process and afford his client the benefit of a fair trial." Diggs, 833 F.2d at 444-45.  Consequently, great deference is given in evaluating counsel's performance, and there is a strong presumption that counsel's challenged actions constitute sound trial strategy.  Strickland, 466 U.S. at 689.

Second, even if the court finds counsel's conduct to have been deficient, petitioner must nevertheless show that his defense was prejudiced by the deficient performance in order to justify setting aside the verdict.  United States v. Griffin, No. 91-612, 1993 WL 34927, at *5 (E.D. Pa. Feb. 9, 1993).  To establish the requisite prejudice under this second prong, petitioner must show that counsel's errors were so serious as to deprive him of a fair trial, i.e., one having a reliable result. Strickland, 466 U.S. at 694.  In order to do so, petitioner must establish a reasonable probability that but for counsel's errors, the result of the trial would have been different.  Id.  A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial.  Id.  This second prong must be evaluated by a totality of the circumstances existing at the time of the trial because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Griffin, 1993 WL 34927, at *5 (quoting Strickland, 466 U.S. at 696).

6

## III.   DISCUSSION

### A.   Failure to Retain a Forensic Chemist as a Defense Expert

Clark asserts that the testimony of the Government's expert in the field of forensic chemistry was a critical component of the Government's case against him and, therefore, it was just as critical for the defense to use one at trial.  (Am. § 2255 Mot. at 5.)  Forensic chemist, Harris, testified at the May 9, 2014 evidentiary hearing that an expert could have assisted trial counsel by highlighting the following key points that were critical to Clark's theory, but were never actually explored by counsel at trial:

> (1) clearly establish the lack of any ephedrine[4] in the "sludge" provided by the Defendant to the informant and in any of the other materials provided, thereby making it impossible to manufacture methamphetamine;

> (2) highlight the inability of the Government to establish what precursor material the Defendant was attempting to use for this alleged methamphetamine cook;

> (3) point out that the bag of items provided by the Defendant to the informant did not include all the necessary equipment, materials, or ingredients for making methamphetamine;

> (4) highlight the lack of any iodine which would have been needed for the methamphetamine production;

> (5) highlight the Government's expert testimony that incorrectly described the glassware provided by the Defendant to the informant; and

---

[4]Jack Fasanello, a forensic chemist for the DEA, testified as an expert for the Government at trial that ephedrine is a precursor chemical that can be used in the clandestine manufacture of methamphetamine and crystal methamphetamine.  (Gov.'s Resp., Trial Testimony Ex. at 252a.)  He also explained that a precursor chemical is a chemical used to manufacture a drug.  (Id. at 253a.)

> (6) establish that the glassware provided was of a kind that demonstrated a level of sophistication with respect to the manufacturing of methamphetamine.

(Am. § 2255 Mot. at 8-9.)

We, however, find these arguments to be without merit.  We first find that an obvious flaw in Clark's argument is that DEA laboratory testing confirmed that none of the substances which Clark gave to the CW contained ephedrine.  Thus, we are of the opinion that it was certainly reasonable for Pagano not to challenge the accuracy and reliability of the DEA testing because he would have wanted the jury to believe that these results were, in fact, accurate and that no ephedrine was found.

We next address Harris' opinion that an expert in forensic chemistry would have been able to assist trial counsel in the cross-examination of the Government's expert chemist.  Harris opined that trial counsel neglected to develop at trial the fact that the DEA laboratory testing confirmed that there was no precursor chemical present in the substances Clark gave to the CW. (Evidentiary Hearing, 5/9/14, at 33-34.)  This assertion, however, is also baseless because the trial record repeatedly reflects that Pagano not only argued to the jury that the substances Clark gave to the CW did not contain ephedrine and could not have been manufactured into methamphetamine, but also elicited testimony on cross-examination establishing this fact. Pagano stated in his opening statement:

> The government will acknowledge, and they must acknowledge, that no methamphetamine could have possibly been made here with the bogus ephedrine that my client provided to the cooperator in this case.

(Gov.'s Resp., Trial Testimony Ex. at 84a.)

Pagano cross-examined the CW regarding the fact that fake ephedrine could not be manufactured into methamphetamine:

> Q.  In order to make ephedrine meth, you need to start with real ephedrine, correct? Yes, or no?
>
> A.  Yes.
>
> Q.  You can't make ephedrine meth with bogus ephedrine, correct?
>
> A.  That is not possible.

(Id. at 223a.)

Pagano next cross-examined the Government's forensic chemist expert as to whether the "sludge" Clark gave to the CW contained a controlled substance:

> Q.  Sir, I just wanted to ask you a few questions about the DEA laboratory reports in this case.  Have you seen them?
>
> A.  No, I've discussed them.
>
> * * * *
>
> Q.  Exhibit 1, to the right of that, the second column, is entitled "Active Drug Ingredient," and below that it indicates "No controlled substance detected," correct?
>
> A. Yes.
>
> Q.  That's because Exhibit 1, as indicated below in the remarks section, indicates that Exhibit 1 contains niacinamide, correct?

A.  Yes.

* * * *

Q.  Nicotinic acid.  Going to the second page, two, there are
Exhibits 2, 3, and 4 listed there, and the description to the right of
Exhibit 2 is "No controlled substance'" correct?

A.  Correct.

* * * *

Q.  Then, Exhibit Number 4, "No controlled substance detected", correct?

A.  Yes.

(Id. at 263a-265a.)

Pagano further cross-examined the expert regarding the fact that red phosphorus is not a

controlled substance:

Q.  On the lab report, it indicates Exhibit Number 4, red
phosphorus, no controlled substance detected, correct?

A.  Correct.

Q.  Although, red phosphorus is a listed chemical, it's not a
controlled substance, correct?

A.  That is correct.

(Id. at 266a.)

Pagano also cross-examined Agent Yensan as to the contents of the "sludge" and a failed

10

field test that was performed on it:

> Q. Sir, I'm going to show you what's been marked as D-3, direct you to paragraph seventeen.  It says that "CS-1 provided Special Agent Yensan with two bags containing a white pasty sludge."  Do you see that there?
>
> A. Yes, I do.
>
> Q. It says "A field test of the substance was negative for the presence of ephedrine," correct?
>
> A. Correct.
>
> Q. You had done that field test, correct?  At least it says you did.
>
> A. Yes, I believe I was present while Special Agent Pat Traynor conducted that field test.
>
> Q. You are aware of the results of that field test, correct?
>
> A. Yes.
>
> Q. That is was, in fact, negative, correct?
>
> A. Yes.
>
> * * * *
>
> Q. Agent, I know that Mr. Labor went through the lab tests with you, and I believe it's clear, but just to reiterate, none of the substances obtained from Mr. Clark turned out to be ephedrine, correct?
>
> A. This is true.

11

(Id. at 298a, 300a.)

Lastly, Pagano argued in closing that the substance was not ephedrine and, therefore, could not be manufactured into methamphetamine.  He stated:

> Now ladies and gentlemen, the government continues to refer to the exhibits over here and continues to pull this substance here, ephedrine, it is bogus ephedrine, it is sham ephedrine.  It is a vitamin B like substance.
>
> In order for you to find my client guilty of an intent to manufacture anything you must believe that this was ephedrine.  Because if Jimmy Clark didn't think or didn't know that this was ephedrine then it would be impossible to make meth with this substance.
>
> In fact, it is impossible for him to make meth with this substance. We know from Police - - I'm sorry, Mr. Fascinella, the chemist from DEA, we know from the agents in this case and we know from Mr. Labor[5] himself that it is impossible to make methamphetamine with this substance.

(Id. at 364a- 365a.)  Thus, it is clear from the above that Pagano argued and brought out numerous times in cross-examination that the substance Clark gave to the CW did not contain ephedrine and could not be manufactured into methamphetamine.

Clark also contends that an expert in forensic chemistry could have testified that Clark's possession of a laboratory grade flask reflected a high level of sophistication about the manufacture of methamphetamine.  Harris opined that someone with that level of sophistication would know that it would be impossible to manufacture methamphetamine with the bag of materials Clark gave to the CW, which would demonstrate that Clark lacked the intent to manufacture methamphetamine.  (Evidentiary Hearing, 5/9/14, at 22.)  We, however, agree with

---

[5]Frank A. Labor III, Esq., was the Assistant United States Attorney who prosecuted this action.

12

the Government that a jury could certainly infer from expert testimony concerning Clark's sophistication in making methamphetamine that in providing another methamphetamine cooker with red phosphorous, Red Devil, lye, and a laboratory grade flask that his intent was to manufacture methamphetamine with the help of another methamphetamine cooker.  Thus, we are of the opinion that such testimony could have actually prejudiced Clark's defense rather than support it, and therefore, this claim is without merit.

For all the reasons discussed above, we find that Pagano was not "deficient" under the first prong of the Strickland analysis and, accordingly, he did not provide ineffective counsel for failing to retain a forensic chemist as an expert to testify at trial.[6]

### B.    Advising Clark Not to Testify in His Own Defense

Clark asserts that he was ready and willing to testify in his own defense at trial, but was advised by Pagano not to do so.  (Am. § 2255 Mot. at 12.)  He argues that:

> "no other witness could have established [his] knowledge and intent better
> than [himself].  Given that [his] knowledge of the substances, knowledge
> of the methamphetamine manufacturing, and his intent to have
> methamphetamine produced and distributed was at the heart of the
> Government's case, it was unreasonable for [his] counsel to have advised
> him to give up his right to testify in his own defense at trial."  (Id.)

(Id.)  We disagree.

_____

[6]Clark also alleges that trial counsel was ineffective for not filing a motion for a continuance or a motion to exclude the Government's expert testimony because the Government did not provide trial counsel with its notice of its intent to call a forensic chemist as an expert until a week before trial. However, the record indicates that is simply incorrect.  Trial started on February 8, 2009, and the Government provided Pagano with notice on November 10, 2008, of its intent to call a chemical expert who would testify as to the methamphetamine manufacturing process.  (Govt.'s Resp., Ex. 13 at 3.)

The record indicates that Pagano had a number of sound tactical reasons why Clark wasn't called to testify at trial, and he gave these reasons at the evidentiary hearing.  He first testified as to his experience as a trial attorney stating that:

> And I've had dozens and dozens of tape cases, and I can't remember one where I've put my client on the witness stand. Some I'd say probably more than 50 percent of the time.  Some I've been successful on, some I haven't.

> I'd say probably more than 50 percent of the time though I've been successful in arguing what my client's intentions are without putting my client on the witness stand, given the surrounding circumstances and given what happens or doesn't happen following a conversation.

(Evidentiary Hearing, 10/28/13, at 28.)  He stated that in the instant case, he met with Clark approximately ten times in prison, and that he discussed with Clark the issue of whether to have him testify on his own behalf on at least half of those occasions.  (Id. at 29.)  He testified regarding his confidence in his client as a witness and the issue of the impression to a jury concerning the burden of proof:

> Well, some are, and I'm speaking generally, but you have to have a client that you have confidence in to the point that you believe that they are capable of convincing 12 people that they're telling the truth.

> And also, often times when you present your client as a witness in the case the jury incorrectly - - it creates an impression that the defense has a burden of proof and it's  - - and it's a problem of shifting burdens.

> And if you don't have a witness or a client that you have enough confidence in in being capable of convincing a jury, then you really should probably not call your client as a - - witness in the case.

14

(Id. at 33.)

In addition to Pagano lacking confidence in Clark's ability to be a credible witness before the jury, he testified as to additional reasons for the decision to not have Clark take the stand: (1) the fact that Clark had met with the agents on at least two occasions and provided statements after his arrest would have had a "huge impact" on his decision; (2) the fact that the Government had considerable physical evidence consistent with the intent to manufacture methamphetamine, such as Clark's possession of the red phosphorus and the laboratory flask, that would have been difficult for Clark to explain; and (3) the recordings that Clark was confronted with that were damaging and, most likely, unexplainable.  (Id. at 60-62, 65, 84.)  Pagano further stated that: "[n]o matter what [Clark's] ability would be on a witness stand or anywhere to convince people of anything having to deal with those other issues I think would be unexplainable and I don't think he would have served himself well by testifying in this case."

(Id. at 65.)  Pagano added that

> Given the surrounding circumstances of the case, given his prior history, given his prior history with this particular witness, I just - - thought that there was - - that that course of action was fraught with complications, none of which would have furthered the defense and none of which would have helped Mr. Clark.

(Id. at 29-30.)  Given Pagano's numerous sound tactical reasons for not calling Clark to testify on his own behalf, we cannot find that Pagano was "deficient" for this reason under Strickland's first prong.  Thus, we find this claim to be without merit.[7]

---

[7]It is again notable that although Clark insists that he was "ready and willing" to testify on his own behalf at trial, he did not testify at either of the evidentiary hearings held before us.  Clark could have testified concerning his conversations with Pagano regarding the decision not to testify.  However, he has chosen not to do so.

### C.     Failure to Investigate, Interview, and Call Witnesses at Trial

Clark claims that several witnesses, including Ron Lavan ("Lavan"), Eric Rolfing ("Rolfing"), Mary Lynn Halas ("Halas"), and Sherry Baker ("Baker") were available to provide testimony at trial supporting his defense that he knew the substance he provided to the CW was not ephedrine, but rather the benign vitamin supplement, Vitablend, which is  incapable of being used in the production of methamphetamine.  (Am. § 2255 Mot. at 15-19.)

There is no question that one of the duties of an attorney is to investigate the circumstances of an alleged crime.  See United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989).  Counsel's "decision not to investigate must be directly assessed for reasonableness."  Strickland, 466 U.S. at 691.  In addition, courts have repeatedly considered the lack of credibility of a witness in assessing prejudice.  See, e.g., Cagle v. Branker, 520 F.3d 320, 326-27 (4th Cir. 2008) (finding no prejudice because potential witness lacked credibility); Sullivan v. DeLoach, 459 F.3d 1097, 1111 (11th Cir. 2006) (finding no prejudice because the potential witness's "testimony wholly lacked credibility"); Thompson v. Nagle,118 F.3d 1442, 1453 (11th Cir. 1997) (affirming denial of habeas corpus petition because potential witnesses, who were not called and who allegedly would have testified in petitioner's favor at trial, were not believable).

Moreover, decisions on which witnesses to call are generally strategic decisions entrusted to counsel and are protected from second-guessing.  Sanchez v. Tennis, No. 04-4005, 2005 WL 645926, at *9 (E.D. Pa. Mar. 17, 2005); United States v. Merlino, 2 F. Supp. 2d 647, 662 (E.D. Pa. 1997).  Counsel need not call every suggested witness, but only those likely to assist their case.  Id.

**1.      Rolfing**

Clark asserts that Rolfing, who was in the car when he was arrested and was present when he gave statements to law enforcement officers, "could have corroborated [his] claim that he specifically told police that he knew the item provided to him by the CW was fake, and not in fact methamphetamine." (Am. § 2255 Mot. at 17.)  This claim, however, is without merit for several reasons.

First, there is no evidence in the record as to what Rolfing's proposed testimony would have been.  Clark asserted that he would submit an affidavit from Rolfing setting forth his proposed trial testimony. (§ 2255 Mot. at 10 n.8.)  However, Clark has failed to do so.  In addition, Clark never called Rolfing to testify at either evidentiary hearing held by this Court. Pagano also testified that he interviewed Rolfing and that he recalled that he made a decision not to call him as witness "either because he didn't want to be called or because of the fact that his information wasn't going to advance the defense." (Evidentiary Hearing, 10/28/13, at 19.) Moreover, Pagano knew that Clark had given a post-arrest statement to the agents implicating Rolfing as the potential distributor of the methamphetamine that the CW had supposedly manufactured.  Pagano testified that he believed that Rolfing would assert the Fifth Amendment if called to testify. (Id. at 57-58.)  Thus, based upon his professional judgment, Pagano made the decision not to call Rolfing as a trial witness.  Because of these valid strategic decisions, Pagano cannot be deemed "deficient" under Stickland's first prong.

**2.      Lavan**

Next, with regard to Lavan, Clark submitted an affidavit from Lavan which stated that he

was prepared to testify at trial that the "sludge" that was put into the plastic bag for the informant was a vitamin supplement called Vitablend, and was part of a plan to seek retribution against the CW for past acts.  (Mot. § 2255, Ex. 1.)  Clark argues that this witness could have substantiated what Pagano told the jury in his opening statement regarding the ruse presented by him and his intention to exact some form of retribution upon the CW.  (Am. Mot. at 16-17.)  This claim is also without merit.

Lavan states in his affidavit that "Jimmy [Clark] regularly used a vitamin supplement called 'Vitablend' and their [sic] presence was a common sight in his home and office."  (Mot. § 2255, Ex. 1 at ¶ 2.)  He also states that "a few days before June 3, 2008, Jimmy called me in his office to instruct me to pour all the Vitablend bottles in the office closet into plastic Ziploc bags," and that "[l]ate in the afternoon of June 3, 2008, Jimmy requested me to bring the box containing bags of Vitablend to him at his house."  (Id. at ¶¶ 6, 9.)  He further adds that "I subsequently learned that the Vitablend put into the bags were meant for this guy named 'Butch' as part of some plan to get retribution for past acts against Jimmy and his friends."  (Id. at ¶ 8.)

Pagano, however, did investigate Lavan and testified that he interviewed him.  (Evidentiary Hearing, 10/28/13, at 18.)  He recalled Lavan being the individual that Clark called while he was with law enforcement officers at his home asking him to bring certain substances to his home, and that it was Lavan who delivered the substances to his home.  (Id. at 40.)  We agree with the Government that Clark mischaracterizes Lavan's potential testimony, and that it would not have benefitted his defense.  As discussed earlier, there was never a question in this case that the substance that Clark gave to the CW did not contain ephedrine and could not have been made into methamphetamine.  Moreover, Clark's assertion that Lavan could have testified that "the use

18

of Vitablend was part of a plan to seek retribution against [Hummel] for past acts," would not have been admissible at trial under the Federal Rules of Evidence.[8]  As Lavan stated in his affidavit, he "subsequently" learned that the bags of Vitablend were part of a plan to get retribution against the CW.  (Mot. § 2255, Ex. 1 at ¶ 8.)  It is clear that anything Lavan might have later learned about a plan to use the Vitablend for retribution was based upon inadmissible hearsay.

In addition, Pagano testified that he recalled that Clark had provided law enforcement agents with a statement identifying Lavan as the source of the ephedrine.  (Evidentiary Hearing, 10/28/13, at 63-64.)  Pagano testified that this fact would have been a "big factor" in his decision not to call Lavan as a witness because "it's further and additional evidence of intent."  (Id. at 64.)  Pagano also testified that his decision not to call Lavan as a witness was based upon his professional judgment and strategic analysis of the evidence.  (Id.)  Consequently, we find that Clark has failed to establish that Lavan could have provided any testimony that would have been helpful to his defense.  Thus, Pagano was not "deficient" under Strickland for not calling Lavan as a witness.

### 3.    Baker and Hallis

Lastly, Clark asserts that Baker and Hallis should have been called as witnesses.  He contends that Baker should have been a witness because she was his assistant for several years and was familiar with his use of Vitablend.  (Am. § 2255 Mot. at 17.)  Baker states in her affidavit that in the summer of 2007, she ordered twelve pounds of Vitablend for Clark.  (Mot.

---

[8]See generally Federal Rules of Evidence 802- 804.

§ 2255, Ex. 2 at ¶ 5.)  Similarly, Hallas states in her affidavit that in the summer of 2007, in lieu of payment for topsoil she ordered from Clark, he asked her to order him twelve pounds of Vitablend from the Vitamin Shoppe.  (Id., Ex. 3 at ¶ 3-4).  Hallas also states that Pagano never contacted her.  (Id. at ¶ 8.)  We, however, find that Pagano was not "deficient" in choosing not to call either of these individuals to testify.

Pagano testified that he recalls speaking to Baker, but not Hallis.  (Evidentiary Hearing, 10/28/13, at 40-41.)  He stated that he did not call either as witness, but did recall that there were a couple of witnesses in this case that did not want to get involved.  (Id. at 41.)  However, as reiterated several times, there was never an issue that the "sludge" supplied to the CW did not contain ephedrine.  Thus, these witnesses' knowledge that Clark used Vitablend would not have been helpful to his defense.  Accordingly, Pagano's decisions not to call these witnesses cannot be deemed "deficient" under Stickland's first prong.[9]

In conclusion, it is apparent from the record that Pagano did investigate the defense witnesses identified by Clark and discussed their potential testimony with him.  Furthermore, he made strategic decisions, based on his professional judgment, not to call them because they would have been harmful to Clark's defense or were irrelevant.  Thus, trial counsel was not "deficient" under the first prong of Stickland.  Because a finding against Clark under either Strickland prong is sufficient to find for the Government, Clark has not established that Pagano rendered him ineffective assistance of counsel.  See Ciancaglini, 945 F. Supp. at 816.

---

[9]We note that Clark did not call any of these potential witnesses to testify at the evidentiary hearings.

### D.     Lack of Evidence of Clark's Alleged "Ruse" Defense[10]

As summarized earlier in this Memorandum Opinion, in his affidavit, Clark alleges facts

which he claims supports his "ruse" defense.  (See Mot. § 2255, Clark Aff. ¶¶ 4-28.)  Clark

asserts that the "sludge" which he told the CW was the remnant of a botched methamphetamine

cook, was actually a mixture of water and a vitamin supplement called "Vitablend."  (Id. ¶¶ 7-8.)

Clark claims that he made the sludge and gave it to the CW as a "ruse" or "pretext" so that the

CW would meet with him again.  (Id.)  Clark contends that the "ruse" was a plan improvised by

him at the spur of the moment to gain time for him to contact and meet with his friends to whom

the CW owed money.  (Id. ¶ 10.)  Clark further asserts that he told law enforcement agents at the

time of his arrest that the sludge was not ephedrine, and that he, specifically, showed Agent

Yensan a Vitablend bottle in his house which he used to make the sludge and explained to him

how he made it.  (Id. ¶¶ 17, 20.)  Clark argues that "[h]ad the jury been informed that I correctly

believed the substance given to [the CW] was a vitamin supplement I believe I would have been

acquitted at trial."  (Id. ¶ 37.)

The record, however, does not support Clark's elaborate "ruse" defense that he now

asserts.  Actually, the only evidence in the record of this defense is Clark's affidavit.  As noted

several times already, not only did Clark not testify at trial, but he chose not to testify at either

---

[10]Clark's Amended § 2255 Motion asserts only the three ineffective counsel claims discussed
above.  In his original § 2255 Motion, Clark argued that the record contained significant evidence of his
alleged "ruse" defense.  Although Clark's Amended Motion does not raise this issue, we will address it
nonetheless.  We again note that the Third Circuit affirmed Clark's conviction, specifically finding that
there was sufficient evidence to support his conviction for attempting to manufacture and possess with
intent to distribute methamphetamine.  See Clark, 419 F. App'x at 240.  Clark argued on appeal that there
was not enough evidence to prove that he intended to produce methamphetamine because the substance
he provided to the informant was incapable of being turned into methamphetamine.  Id.  The Court held
that "impossibility" is not a defense to attempt.  Id.

evidentiary hearings held before this Court.

Moreover, Clark's claim that he told investigative agents at the time of his arrest the facts supporting his "ruse" defense and, specifically, that the sludge was actually Vitablend is directly contradicted by the testimony of Agent Yensan at the October 28, 2013 evidentiary hearing. Agent Yensan testified that he interviewed Clark after his arrest and that he was continuously in the presence of Clark for eight and one half hours. (Evidentiary Hearing, 10/28/13, at 90.) Agent Yensan testified:

> Q.  Now, during that approximately eight and a half hour period was Mr. Clark speaking with you?
>
> A.  Yes
>
> Q.  At any time during that eight and a half hour period did Mr. Clark make a statement to you that his transactions with the informant, and for purposes of identification, we'll refer to the informant as Butch, is that correct?
>
> A.  That is.
>
> Q.  Okay.  Did Mr. Clark ever make a statement that his dealings with Butch were a ruse?
>
> A.  No.
>
> Q.  Did he ever make a statement that his dealings with Butch involving ephedrine and methamphetamine were a pretext?
>
> A.  No.
>
> Q.  Did Mr. Clark ever make the statement that he had provided a package of sludge to Butch earlier on that he had made from Vitablend?
>
> A.  No.

* * * *

> Q.  During the entire eight and half hours that you were with Mr.
> Clark on the date of his arrest did Mr. Clark say anything about
> Vitablend?
>
> A.  Never.

(Id. at 90-91.)

Agent Yensan further testified that he had another meeting with Clark on June 9, 2008,

and interviewed him in the presence of his attorney.  (Id. at 92.)  He testified:

> Q.  Now, during that interview did Mr. Clark make any statement
> about - - to the effect that his dealings - - that the facts of this case
> involved his - - Clark's dealings with Butch and those dealings
> were just a ruse?
>
> A.  No.
>
> * * * *
>
> Q.  During the June 9th meeting did Mr. Clark make any statement
> to the effect that the substance that he had given to Clark at
> multiple times during the investigation was, in fact, Vitablend?
> Did he ever make that statement?
>
> * * * *
>
> A.  No.

(Id. at 93-94.)  Agent Yensan also testified that he met with Clark and his attorney again on

August 5, 2008.  (Id. at 96.)  Agent Yensan stated that during this meeting he discussed the facts

of this case with Clark, and again Plaintiff did not make any statement to him that his dealings

with Butch were a "ruse" or "simply a pretext."  (Id.)  In addition, Clark made no statement that

the sludge material he provided to Butch was actually made by him from Vitablend.  (Id. at 97.)

In addition, we note that while Pagano did not specifically argue at trial that the sludge

was actually Vitablend and that Clark made the Vitablend sludge to dupe the CW, he did argue to

the jury that they should consider the possibility that Clark was defrauding the CW.[11]  Pagano

stated in his opening statement:

> We agree on the point that the central issue in this case is what
> were Mr. Clark's intentions, because in order to prove my client
> guilty of attempting to manufacture methamphetamine, they need
> to show that they were his intentions, but merely to dupe or defraud
> [the CW], not merely to extort money from [the CW], and please
> keep in mind that there are only two charges.
>
> So, if Mr. Clark, if his intentions were to defraud someone, he's
> not been indicted for attempting to extort money, or to commit any
> sort of theft offense against [the CW].  He's charged with
> attempting to manufacture methamphetamine.

(Govt.'s Resp., Trial Transcript Ex. at 84a.)

In addition, Pagano stated in his closing argument:

---

[11]Pagano responded to Clark's affidavit with an affidavit of his own.  Pagano states that:

> 1.  With regard to Clark's assertion that he created a sludge-like
> substance in his upstairs while the CW remained downstairs and that the
> sludge was produced by mixing the contents of a powered vitamin
> supplement, he doesn't recall ever being informed of these facts by
> Clark;
>
> 2.  With regard to Clark's assertion that he gave the CW the bag of
> sludge on the pretense that it was the remnants of a botched
> methamphetamine cook, Pagano states that "I don't believe this to be
> true, but I don't recall being told by Mr. Clark that it was a pretense";
> and
>
> 3.  With regard to Clark's assertions that the "methamphetamine ruse
> was a plan improvised by me at the spur of the moment intended to gain
> time for me to contact and meet with my friends to whom [the CW]
> owed money," Pagano states that he did not recall being informed of
> these facts by Clark.

(Govt.'s Resp., Ex. 1.)

> It is not beyond [the CW] to set up this man and it is not beyond
> him to conduct what the government characterized as a cat and
> mouse game here.  In listening to those tapes, in listening to those
> tapes ladies and gentlemen, how do we know that Mr. Clark isn't
> doing the very same thing to [the CW] and that [the CW] is trying
> to do to Mr. Clark.  We know from [the CW] that this business is a
> dirty business, we know this business is full of unscrupulous
> people who do unscrupulous things.  We know that this substance
> from Fascinella, we know that this substance here, this nysidimide
> [sic] is commonly used to rip off other people in this business.  We
> know that rip offs are common, that fraud is common.
>
> So how do we know that Jimmy Clark wasn't trying to get even with
> Butch for what he did to him back in July of 2007?  How do we know that
> Mr. Clark wasn't trying to set up Butch, [the CW], that way Butch was
> trying to set him up.  How do we know that Mr. Clark wasn't attempting
> to have [the CW] produce a sham substance that Mr. Clark would then go
> sell to someone else for two hundred thousand and do whatever he
> intended to do with the money.  That is not what he is charged with here.
> He is charged with knowing that this is a real substance or thinking it is a
> real substance.  He is charged with attempting to manufacture and he has
> to have the specific intent to do it.

(Id. at 369a-370a.)  From the above, it is clear that Clark's alleged defense that the transactions

with [the CW] were a setup with a fake substance to defraud him was actually argued at trial by

Pagano.  However, the elaborate sham involving Vitablend and the CW which Clark claims he

informed Pagano about is simply not supported by the evidence in the record.  Accordingly, we

find that this claim is without merit.  Therefore, for the reasons discussed above, Clark's § 2255

Motion is denied.

An appropriate Order follows.

25